STATE OF NORTH CAROLINA v. STACEY ANTHONY TYLER

No. 11A96

(Filed 6 June 1997)

**1. Evidence and Witnesses § 1009 (NCI4th)— capital murder—victim's statements—guarantees of trustworthiness**

The trial court did not err in a capital prosecution for first-degree murder by admitting testimony from a nurse under N.C.G.S. § 8C-1, Rule 804(b)(5) regarding the victim's statements that defendant had poured gasoline on her and set her on fire. Although defendant contended that the court erred in concluding that the victim's statements possessed the requisite circumstantial guarantees of trustworthiness, the victim had personal knowledge of the circumstances in which she was burned; there was no indication that she had any reason to tell anything other than the truth after she learned that defendant was in jail and could no longer hurt her or her children, there is no indication that the victim ever recanted this statement, and she was unavailable.

**Am Jur 2d, Evidence §§ 701, 702.**

**Residual hearsay exception where declarant unavailable: Uniform Evidence Rule 804(b)(5). 75 ALR4th 199.**

**2. Evidence and Witnesses § 1009 (NCI4th)— capital murder—victim's statements—residual hearsay exception— Confrontation Clause violation—not prejudicial**

There was no prejudicial error in a capital prosecution for first-degree murder in the admission of testimony from a nurse regarding the victim's statements that defendant had poured gasoline on her and set her on fire where defendant contended that the Confrontation Clause of the Sixth Amendment was implicated. Although the trial court relied upon corroborating evidence in concluding that the victim's out-of-court hearsay statements possessed the requisite degree of trustworthiness and hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness and not by reference to other evidence at trial to be admissible under the Confrontation Clause, the trial court did not err in concluding that the victim's statements were inherently trustworthy. The

error was in relying in part upon the corroborating evidence and the conclusion is correct.

**Am Jur 2d, Evidence §§ 701, 702.**

**Residual hearsay exception where declarant unavailable: Uniform Evidence Rule 804(b)(5). 75 ALR4th 199.**

3. **Evidence and Witnesses §§ 2159, 2271 (NCI4th)— capital murder—treating nurse—opinion concerning cause of death and effect of sedative**

The trial court did not err in a capital prosecution for first-degree murder by permitting a nurse to give an opinion about the cause of the victim's death and about the effects of a sedative medication administered to the victim. Defendant made only general objections to the nurse rendering her opinions and failed to make a specific objection about her expertise in diagnosing the victim's cause of death. In any event, it is clear that the witness was properly qualified to state an opinion as to whether the burns she observed on the victim were similar to other burns of this type which she had seen before and the evidence clearly indicates that, through study and experience, she was better qualified than the jury to form an opinion on the cause of death and the effect of the sedative medication. Her position as a nurse was merely a factor to be considered by the jury in evaluating the weight and credibility of her testimony.

**Am Jur 2d, Expert and Opinion Evidence §§ 60-62, 248.**

**Admissibility of opinion evidence as to cause of death, disease, or injury. 66 ALR2d 1082.**

4. **Evidence and Witnesses § 2242 (NCI4th)— capital murder—testimony of treating nurse—partial reliance on hospital records**

The trial court did not err in a capital prosecution for first-degree murder by allowing a nurse who treated the victim before she died and who testified as to the victim's cause of death to base her opinion in part on the notes made by other medical personnel in the hospital records. The records detailed the victim's treatment, progress, deterioration, and death, the witness testified that she was a registered nurse working in the burn trauma unit and familiar with the victim's medical records, the records were made during the victim's stay at the hospital and were kept

STATE v. TYLER

[346 N.C. 187 (1997)]

contemporaneously with the victim's care, and the records were kept by the hospital in the regular course of the hospital's business. Thus, the State laid a proper foundation for the introduction into evidence of the victim's medical records.

**Am Jur 2d, Expert and Opinion Evidence §§ 237, 238.**

5. **Criminal Law § 475 (NCI4th Rev.)— capital murder—prosecutor's argument—no error**

There was no error requiring intervention *ex mero motu* in a capital prosecution for first-degree murder where the prosecutor argued that the victim had concealed her face from her children to prevent a scene in which defendant might assault her children.

**Am Jur 2d, Trial § 631.**

6. **Criminal Law § 438 (NCI4th Rev.)— capital murder—prosecutor's argument—defendant as batterer**

There was no error requiring intervention *ex mero motu* in a capital prosecution for first-degree murder where defendant contended that the prosecutor's argument sought to use public sentiment against domestic abuse to enlist jurors' help in a general effort to deter abusive spouses and boyfriends from escalating the level of abuse to murder. The guilt-phase evidence of defendant's abuse of the victim, both physical and emotional, was clear and uncontradicted and the prosecutor never suggested that the jury should convict defendant in order to prevent him from killing or battering again or that the jury should convict him because other batterers kill their victims.

**Am Jur 2d, Trial §§ 648, 649, 655.**

7. **Constitutional Law § 342 (NCI4th)— capital murder— unrecorded bench conferences—defendant in courtroom— no objection**

The trial court did not err in a capital prosecution for first degree murder by conducting unrecorded bench conferences with defense counsel and counsel for the State where defendant was present in the courtroom but made no request to be present at the bench and made no objection to his absence.

**Am Jur 2d, Criminal Law §§ 695, 698, 699, 905, 925.**

**8. Criminal Law § 444 (NCI4th Rev.)— capital murder—prosecutor's argument—defendant's truthfulness**

The trial court did not err by failing to intervene *ex mero motu* during the penalty phase closing argument in a first-degree murder prosecution where the prosecutor said, "Well, putting the hand on the Bible and told about 35,000 whoppers and then he walked on it and did it." This comment, standing alone, does not equate to the type of specific, objectionable language referring to defendant as a liar that would require that defendant be granted a new capital sentencing proceeding. Many eyewitnesses described the defendant's physical and emotional abuse of the victim, which defendant denied. The prosecutor's argument was no more than an argument that the jury should reject defendant's testimony because his version of events was unbelievable.

**Am Jur 2d, Trial § 632.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial—modern cases. 88 ALR4th 8.**

**9. Criminal Law § 466 (NCI4th Rev.)— capital murder—penalty phase—closing arguments—parole eligibility**

The trial court did not err during a capital first-degree murder prosecution by granting the State's motion to prohibit defense counsel from discussing parole eligibility for a life sentence during penalty-phase closing argument.

**Am Jur 2d, Trial § 575.**

**10. Criminal Law § 1370 (NCI4th Rev.)— capital sentencing—especially heinous, atrocious or cruel aggravating circumstance—instructions**

The trial court in a first-degree murder prosecution did not allow the jury to find the especially heinous, atrocious, or cruel aggravating circumstance based on an unconstitutionally vague instruction.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

**11. Criminal Law § 1352 (NCI4th Rev.)— capital sentencing—instructions—mitigating circumstances—burden of persuasion**

The trial court did not err in its instructions defining defendant's burden of persuasion to prove mitigating circumstances in a capital prosecution for first-degree murder.

**Am Jur 2d, Trial §§ 1120, 1121.**

**12. Criminal Law § 1375 (NCI4th Rev.)— capital sentencing—mitigating evidence—mitigating value**

The trial court did not commit plain error that violated the Eighth and Fourteenth Amendments in a capital prosecution for first-degree murder by allowing the jurors not to give effect to mitigating evidence if the jury deemed the evidence not to have mitigating value.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**13. Criminal Law § 1375 (NCI4th Rev.)— capital sentencing—mitigating circumstances given no effect**

The trial court did not commit plain error in a capital prosecution for first-degree murder by allowing jurors not to give effect to mitigating circumstances found by the jurors.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**14. Constitutional Law § 371 (NCI4th)— death penalty—not unconstitutional**

The death penalty is not inherently cruel and unusual and the North Carolina capital sentencing scheme is not unconstitutionally vague and overbroad.

**Am Jur 2d, Crimimal Law §§ 625, 628.**

**15. Criminal Law § 1402 (NCI4th Rev.)— death sentence—not disproportionate**

A sentence of death was not disproportionate where the record fully supports the sole aggravating circumstance found by the jury, there was no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration, this case was not substantially similar to any case in which a death sentence was found disproportionate, and it is more similar to certain cases in which the death sentence was found to be proportionate. Distinguishing features of

this case are that defendant was convicted of first-degree murder under the theory of premeditation and deliberation; the first-degree murder was preceded by prior physical and mental abuse of the victim; the aggravating circumstance submitted to and found by the jury was "that the killing was especially heinous, atrocious, or cruel"; defendant killed the victim by setting her on fire and watched her burn; defendant showed no remorse; and the jury only found seven of twenty-five mitigating circumstances and only one of those was statutory, that defendant had no significant history of prior criminal activity.

**Am Jur 2d, Criminal Law § 628.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Grant (Cy A.), J., at the 16 October 1995 Special Criminal Session of Superior Court, Hertford County. Heard in the Supreme Court 16 April 1997.

*Michael F. Easley, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Benjamin Sendor, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

In a capital trial, defendant, Stacey Anthony Tyler, was convicted by a jury of the first-degree murder of Mary Jennings Fleetwood. In a capital sentencing proceeding conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court imposed a sentence of death. For the reasons discussed herein, we conclude that defendant's trial and capital sentencing proceeding were free of prejudicial error and that the death sentence is not disproportionate. Accordingly, we uphold defendant's conviction of first-degree murder and sentence of death.

The State's evidence presented at trial tended to show the following facts and circumstances. On numerous occasions, prior to and on 5 November 1993, defendant physically and emotionally abused and battered his girlfriend, Mary Jennings Fleetwood (Fleetwood). Several witnesses testified that this abuse included defendant's holding Fleetwood by the hair and hitting her in the face with his fist, throwing the full weight of his body on her, kicking her, yelling at her, calling her names, and threatening to kill her. Approximately six months prior to Fleetwood's death-causing injuries, Fleetwood

STATE v. TYLER

[346 N.C. 187 (1997)]

threatened to call the police and have defendant removed from her home. Defendant told Fleetwood that when she got ready "to go to work in the morning that she better take her clothes and take her children and that they better take their clothes, that he was going to burn the trailer down and said if they are in the trailer, he was going to burn their m----f------ a-- up in the trailer too." On 5 November 1993, defendant carried out his threat when he poured gasoline on Fleetwood, set her on fire with a match, and watched her burn. Seventy-five percent of Fleetwood's skin was burned off her body. She was transported to a burn-trauma center at Sentara Norfolk General Hospital in Norfolk, Virginia, where she died fifteen days later.

Defendant did not testify and did not present any evidence at trial.

The trial court denied defendant's motion to dismiss made at the close of the State's evidence. The jury returned a verdict of guilty of first-degree murder.

At defendant's capital sentencing proceeding, defendant presented evidence tending to show that he had worked for two years unloading produce trucks and that he had been a good employee. Defendant had been a confidential informant on drug activity for the Murfreesboro Police Department and had provided reliable information on four drug cases. Defendant also presented the testimony of Jean Stacy (Stacy), a nurse and a certified emergency medical technician who assisted in taking Fleetwood to the hospital. Stacy testified that Fleetwood did not want to go to the hospital on 5 November 1993 and that she did not mention any pain. She also testified that defendant had been burned on one or both arms. Further, defendant presented testimony tending to show that he had an alcohol-abuse problem.

Defendant testified at the capital sentencing proceeding that he was teased as a child for his stuttering problem and because he was poor. His high-school years were difficult because his mother had died and he had been very close to her. He left high school due to depression over her death. He worked as a laborer and later worked unloading produce trucks. Defendant testified that he had adjusted to incarceration and that he had not been punished for any infractions while in prison. His only prior convictions were for driving while impaired. Defendant also testified that he had become a Christian while in prison.

Defendant denied throwing gasoline on Fleetwood, hitting her, throwing his full body weight on her, calling her names, and threatening to kill her. Defendant testified that he pushed Fleetwood out the back of the trailer when she was on fire and that he helped her inside to the bathtub and turned on the water. Defendant admitted that Fleetwood had attempted to convince him to leave the trailer on several occasions, but he denied threatening to burn the trailer.

At the capital sentencing proceeding, the sole aggravating circumstance submitted to and found by the jury was that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9) (Supp. 1996). The jury considered the following statutory mitigating circumstances, rejecting all but the first: (1) defendant has no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (2) defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); (3) defendant's age at the time of this offense is a mitigating circumstance, N.C.G.S. § 15A-2000(f)(7); and (4) the catchall mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). The jury also considered twenty-one nonstatutory mitigating circumstances, finding six to exist. The jury unanimously found that the mitigating circumstances were insufficient to outweigh the aggravating circumstance and that the aggravating circumstance was sufficiently substantial to call for imposition of the death penalty when considered with the mitigating circumstances found by one or more of the jurors. Accordingly, the jury unanimously recommended and the trial court imposed a sentence of death. Defendant appeals to this Court as of right from the sentence of death, making twelve arguments based on twenty-one assignments of error.

[1] Defendant's most serious challenge to his conviction relates to the admission of evidence under the residual or "catchall" exception to the hearsay rule. By six assignments of error, defendant contends that the trial court violated his rights under the Confrontation Clause of the Sixth and Fourteenth Amendments to the United States Constitution and under North Carolina law by admitting, under the residual exception to the hearsay rule, evidence concerning the victim's incriminating responses to questions asked by a nurse, Donna Rosenfeld. Defendant argues that the trial court erred in admitting Rosenfeld's testimony regarding out-of-court statements made by the victim prior to her death in which she identified defendant as the person who poured gasoline on her and set her on fire. Defendant claims that the circumstances surrounding the statements did not have suf-

ficient guarantees of trustworthiness and that the trial court made improper findings in its determination of trustworthiness. Defendant contends that the trial court relied upon testimony by other witnesses about events leading up to the burning and about previous alleged wrongdoing by defendant in order to find circumstantial guarantees of trustworthiness, rather than on the inherent trustworthiness of the victim's nonverbal responses to questions.

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. N.C.G.S. § 8C-1, Rule 801(c) (1992). "Hearsay testimony is not admissible except as provided by statute or by the North Carolina Rules of Evidence." *State v. Wilson*, 322 N.C. 117, 131-32, 367 S.E.2d 589, 597 (1988). Rule 804(b)(5) of the North Carolina Rules of Evidence provides for the admission of a hearsay statement when the declarant is unavailable and the statement is not covered by any specific exception but is determined to have "equivalent circumstantial guarantees of trustworthiness." N.C.G.S. § 8C-1, Rule 804(b)(5) (1992); *see State v. Chapman*, 342 N.C. 330, 341-42, 464 S.E.2d 661, 667 (1995) (trial court properly admitted statement under Rule 804(b)(5)), *cert. denied*, ‑‑‑ U.S. ‑‑‑, 135 L. Ed. 2d 1077 (1996); *State v. Daughtry*, 340 N.C. 488, 513-14, 459 S.E.2d 747, 759-60 (1995) (the trial court did not err by allowing, under Rule 804(b)(5), testimony about statements the victim made and a letter she purportedly wrote to defendant), *cert. denied*, ‑‑‑ U.S. ‑‑‑, 133 L. Ed. 2d 739 (1996); *State v. Brown*, 339 N.C. 426, 435-39, 451 S.E.2d 181, 187-89 (1994) (trial court did not err by admitting two out-of-court statements of the victim's wife under Rule 804(b)(5)), *cert. denied*, ‑‑‑ U.S. ‑‑‑, 133 L. Ed. 2d 46 (1995).

"In *State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736 (1986), this Court articulated the guidelines for admission of hearsay testimony under Rule 804(b)(5)." *State v. Peterson*, 337 N.C. 384, 391, 446 S.E.2d 43, 48 (1994). In *Triplett*, this Court said that a trial court must consider the following factors in determining whether a hearsay statement sought to be admitted under Rule 804(b)(5) is trustworthy: (1) whether the declarant had personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination. *Triplett*, 316 N.C. at 10-11, 340 S.E.2d at 742.

In the instant case, before witnesses were allowed to testify as to the victim's statements that defendant poured gasoline on her and set

her on fire with a match, the trial court conducted a hearing on the admissibility of the statements. Following that hearing, the trial court concluded that this evidence fell within the residual hearsay exception of Rule 804(b)(5). In determining that the victim's hearsay statements possessed the necessary circumstantial guarantees of trustworthiness to allow their admission, the trial court made the following pertinent findings of fact:

1. That the declarant, Mary Jennings Fleetwood, is unavailable as defined in N.C.G.S. section 804(A)4. And that the declarant is now deceased.

2. That the State of North Carolina has provided the defendant with written notice of the State's intention to offer the declarant's statements sufficiently in advance of offering them to provide the defendant with a fair opportunity to prepare to meet the statements.

3. That the hearsay statements are not specifically covered under the other exceptions of the hearsay rule.

4. That the hearsay statements of the victim, Mary Jennings Fleetwood, possess circumstantial guarantees of trustworthiness to wit:

. . . .

L. On November 18, 1993, at 4:30 a.m. the victim awoke from a surgical procedure and became reoriented to space and time and that she could follow commands like nod your head and wiggle your toes.

M. That the victim's attending physicians . . . and her nurses . . . noted in the medical records that the victim's mental and physical status had dramatically improved, to wit:

1. On November 18, 1993, the victim became more alert and would nod her head appropriately to yes and no questions and follow commands. She appeared to have no post-operative anesthesia complications and her vital signs were stable.

2. The victim continued to show significant neurological improvement and became more stable as the day passed.

3. On November 19, 1993, the victim continued to remain neurologically intact. She was alert and answered ques-

tions appropriately by mouthing words in a soft whisper and by shaking or nodding her head.

4. The victim could also move all extremities appropriately to commands.

N. The victim's nurse, Donna Rosenfeld, R.N., who had observed the victim's progress and worked with the victim closely, felt that the victim was physically and mentally able to speak to law enforcement officers; therefore, when Ernest Sharpe from the Hertford County Sheriff's Department had come to interview the victim or [when] Chief Deputy Sharpe and Special Agent Kent Parrish of the SBI went to Sentara on November 19, 1993, that Nurse Donna Rosenfeld had been working with the victim all morning.

[NO SECTION "O"]

P. That Nurse Donna Rosenfeld assisted the officers in asking the following questions of the victim:

1. The victim was told by Nurse Rosenfeld that police officers were here to speak to her and if it was okay for them to come in and the victim nodded her head, yes.

2. The victim was asked if [defendant] had done this to her and after a 15-second hesitation the victim nodded her head, no.

3. The victim was told that [defendant] was in jail and could not hurt her any longer and she was asked if she understood this and the victim nodded her head, yes.

[4.] The victim was asked if [defendant] and she had been fighting and the victim nodded her head, yes.

[5.] The victim was asked if [defendant] had thrown gasoline on her and the victim did not give any response. The victim was then told by Nurse Rosenfeld that they, meaning the police officers, had the clothes that she and [defendant] had been wearing. The victim was then asked did [defendant] throw gasoline on [her] and the victim nodded her head, yes.

[6.] The victim was then asked if [defendant] had thrown a match on her after pouring gasoline on her and the victim nodded her head, yes.

Q. That after learning the defendant no longer posed a threat to herself or her children, the victim was motivated to speak the truth about how she was burned.

R. That the victim ha[d] personal knowledge of circumstances under which she was burned.

5. That the victim's statements identifying the defendant as the perpetrator of the burning occurred on November 5, 1993, are evidence of material facts. [The s]tatements are evidence of identity, malice, premeditation, and deliberation, and lack of accident.

6. That the victim's statements are more probative on the issues of identity, malice, premeditation, and deliberation, and lack of accident, [than] any other evidence which the State can produce through reasonable efforts.

7. That the general purposes of the Rules of Evidence in interest of justice will best be served by admission of these statements into evidence.

Based upon its findings of fact, the trial court concluded that the declarant was unavailable because she is deceased; that the State provided timely written notice of its intention to offer the statements; that the hearsay statements were not specifically covered under the other hearsay exceptions; that the hearsay statements possessed circumstantial guarantees of trustworthiness; that the statements were material and more probative on the issues of identity, malice, premeditation, deliberation, and lack of accident than any other evidence which the prosecution could secure through reasonable efforts; and that justice would be served by admission of the statements into evidence.

Defendant argues that the trial court erred in concluding that the victim's statements possessed the requisite circumstantial guarantees of trustworthiness to be admissible. In making this argument, defendant relies primarily upon this Court's decision in *State v. Swindler*, 339 N.C. 469, 450 S.E.2d 907 (1994). In *Swindler*, the trial court erred by admitting into evidence under the residual hearsay exception of N.C.G.S. § 8C-1, Rule 804(b)(5) a jail inmate's letter to a detective concerning statements allegedly made by the defendant about the murder. In that case, we noted that: (1) the trial court failed to make any particularized findings of fact or conclusions of law regarding

STATE v. TYLER

[346 N.C. 187 (1997)]

whether the letter possessed "equivalent guarantees of trustworthiness"; (2) the inmate had no personal knowledge of the events to which he referred in the letter; (3) the inmate was not motivated to speak the truth but rather to say what the police wanted to hear in order to make a deal; (4) while the inmate never recanted his statement, he refused to acknowledge at trial that he wrote the letter, that the letter was in his handwriting, or that he wrote the address on the envelope; (5) the inmate was unavailable because he refused to testify; (6) the letter contained many inaccuracies; (7) the inmate had the opportunity to obtain specific facts about the murder without actually talking with defendant because he was in the courtroom during defendant's probable cause hearing; and (8) the trial court improperly considered corroborating evidence to support the letter's trustworthiness. *Id.* at 475, 450 S.E.2d at 911. Since the author of the letter was not subject to full and effective cross-examination by the defendant, the defendant's rights under the Confrontation Clause were violated by its admission, and the State failed to show that this error was harmless beyond a reasonable doubt since the letter contained the only evidence of the defendant's motive to kill the victim, the letter provided the greatest evidence of premeditation and deliberation, and the letter contained the most specific admission of the defendant's guilt. *Id.* at 476, 450 S.E.2d at 912. The instant case is clearly distinguishable from *Swindler*.

In the instant case, the trial court found that Fleetwood's statements contained sufficient indicia of reliability to be admissible. Fleetwood had personal knowledge of the circumstances under which she was burned. There was no indication that she had any reason to tell anything other than the truth about this matter after learning that defendant was in jail and could no longer hurt her or her children. Nor is there any indication that Fleetwood ever recanted this statement. Finally, the trial court determined that Fleetwood was unavailable because she was deceased at the time of trial. We conclude that the trial court did not err in concluding that the victim's statements possessed circumstantial guarantees of trustworthiness. Accordingly, we find no error in the admission of the victim's hearsay statements under Rule 804(b)(5).

[2] We next consider whether admitting the statements implicated the Confrontation Clause of the Sixth Amendment to the United States Constitution. Defendant contends, as did the defendant in *Swindler*, that the trial court erred in relying upon corroborative evidence in admitting the victim's statements at trial. We agree with

defendant's contention, but we nevertheless conclude that the error was harmless beyond a reasonable doubt.

The United States Supreme Court has stated that an evidentiary rule such as 804(b)(5) is a "residual" hearsay exception, rather than a "firmly rooted" one, and that statements admitted under such a rule do not inherently possess indicia of reliability. *Idaho v. Wright*, 497 U.S. 805, 817, 111 L. Ed. 2d 638, 653-54 (1990). However, a statement which falls under the residual hearsay exception can meet Confrontation Clause standards if it is supported by particularized guarantees of trustworthiness based on the totality of the circumstances surrounding the making of the statement. *Id.* at 817, 820, 111 L. Ed. 2d at 653, 655-56. "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* at 822, 111 L. Ed. 2d at 657; *see also Brown*, 339 N.C. at 438-39, 451 S.E.2d at 189 (the residual hearsay exception does not qualify as firmly rooted for Confrontation Clause purposes, so the trial court must search for circumstantial guarantees of trustworthiness). Further, hearsay evidence that does not fall within a firmly rooted exception is deemed "presumptively unreliable and inadmissible for Confrontation Clause purposes." *Lee v. Illinois*, 476 U.S. 530, 543, 90 L. Ed. 2d 514, 528 (1986). Accordingly, "[c]orroborating evidence should not be used to support a hearsay statement's particularized guarantee of trustworthiness." *Swindler*, 339 N.C. at 475, 450 S.E.2d at 911.

In determining that the victim's out-of-court hearsay statements in the instant case possessed the requisite degree of trustworthiness, the trial court made the following findings of fact in addition to those set out earlier in this opinion:

4. That the hearsay statements of the victim, Mary Jennings Fleetwood, possess circumstantial guarantees of trustworthiness[,] to wit:

A. The defendant beat the victim, Ms. Fleetwood, repeatedly with his fist and jumped on her on November 5, 1993, as witnessed by James Shearn and Ernest Beale, Jr. and that this occurred approximately one hour prior to the victim being burned over 70 percent of her body.

B. That the defendant told the victim, "I'll kill you b----" on November 5, 1993, as witnessed by James Shearn and

Ernest Beale, Jr., and this also occurred approximately one hour before the victim was burned.

C. That the defendant had threatened to burn the victim, her children, and her home on at least two occasions prior to November 5, 1993. And that these statements were witnessed by the victim's 12-year old daughter, Monique Jennings, her 11-year old son, Jermaine Jennings, the victim's friend, Angie Eley, and Ms. Eley's daughter, Monica Eley. And that the last threat of this nature was made approximately six days before the victim was burned.

D. That the defendant told several persons on November 5, 1993, that the victim was burned with a kerosene heater that the victim was refueling and it exploded. The people that [he] told were Roscoe Faison, Roy Robinson, and the Hertford County Sheriff's Deputy, Keith Williams.

E. That Roscoe Faison, Roy Robinson, and Deputy Williams inspected the heater and the premises and found no evidence, in their opinion, of an explosion or fire on or near the heater or in the living room area where the defendant alleged that the explosion occurred.

F. That the defendant also reported to Roscoe Faison, Roy Robinson, and Deputy Williams that the defendant jumped on the victim in an attempt to extinguish her flames and that he pushed her down a hallway. Upon close inspection [by] Hertford County Chief Deputy, Ernest Sharpe, the defendant was found to have suffered minimal burns to his right forearm and the back of his right hand and there were no burns on the palms of his hand.

G. That a green sweater identified by Ernest Beale, Jr., as being worn by the victim on November 5, 1993, was burned and tested by an expert in forensic chemistry from the SBI lab and was determined to have gasoline on it. And that blue jeans owned by the victim and found in the victim's bedroom were also burned and tested and that the jeans also had gasoline on them. Strike that—the victim's bedroom was also burned.

H. That a jug of gasoline with the cap unscrewed was found at the back of the trailer. [Within] a few feet from the gasoline there was found a book of matches.

I. That a few feet from the matches, Chief Deputy Ernest Sharpe located a tree with an area where the leaves were brown unlike the other leaves on the tree and that right below the brown leaves was a spot of burned grass.

J. That the victim was transported to the Roanoke-Chowan Hospital and that nurse Sheri Eubanks asked her what happened and that an EMS person who transported the victim to Roanoke-Chowan answered that the heater exploded causing the victim's burns. That nurse Eubanks asked the victim if that is what happened and that the victim who had been emphatically answering other questions paused for approximately 15 seconds before answering yes.

K. That the victim was transported to Norfolk Sentara Hospital after emergency treatment at Roanoke-Chowan Hospital. And that during the transfer Dr. Hunter of the Roanoke-Chowan Hospital also asked the victim if someone had burned her and the victim again paused for some time before shaking her head no.

We conclude that the trial court erred in relying upon this corroborating evidence in reaching the conclusion that the statements were trustworthy. These findings of fact did not relate to the inherent trustworthiness of the victim's statements. They detail corroborative evidence that could not be relied upon in finding the circumstantial guarantees of trustworthiness required in order to protect defendant's rights under the Confrontation Clause of the United States Constitution. Thus, we conclude that defendant's rights under the Confrontation Clause were implicated.

"A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C.G.S. § 15A-1443(b) (1992); Swindler, 339 N.C. at 476, 450 S.E.2d at 912. The State has met its burden in this case. We note first that the trial court did not commit error in concluding that the victim's statements were inherently trustworthy and therefore admissible under the residual hearsay exception. The error was in relying, in part, upon the corroborating evidence in reaching the conclusion of law that the statements were inherently trustworthy. This conclusion of law, which is fully reviewable on appeal, is fully supported by the evidence and the trial court's findings of fact and is clearly cor-

rect. Therefore, we find the error harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b). Accordingly, defendant is entitled to no relief on these assignments of error.

**[3]** By three assignments of error, defendant contends that the trial court erred by permitting a nurse, Donna Rosenfeld, to give an opinion about the cause of the victim's death and about the effects of a sedative medication administered to the victim. Rosenfeld testified that Fleetwood "died as a result of her burns causing overwhelming sepsis," that is, bacteria was allowed to enter Fleetwood's body and cause "massive infection" since her skin had been burned away. Rosenfeld also testified that the dose of the sedative medication Versed given to the victim would have affected the victim's mental condition for about thirty minutes. Defendant argues that Rosenfeld was unqualified to render her opinions as to these matters.

The State notes, however, that defendant made only general objections to Rosenfeld rendering her opinions as to the cause of the victim's death and the effect of the sedative medication. "An objection to a witness's qualifications as an expert in a given field or upon a particular subject is waived if it is not made in apt time upon this special ground, and a mere general objection to the content of the witness's testimony will not ordinarily suffice to preserve the matter for subsequent appellate review." *State v. Hunt*, 305 N.C. 238, 243, 287 S.E.2d 818, 821 (1982). In this case, defendant failed to make a specific objection about Rosenfeld's expertise in diagnosing the victim's cause of death. "Our Court has adhered to the position that, in the absence of a special request by the defense for qualification of a witness as an expert, such a finding will be deemed implicit in the trial court's admission of the challenged opinion testimony." *Id.* "Moreover, since defendant did not object on the grounds that the testifying witnesses were not qualified as experts, he has waived his right to later make the challenge on appeal." *State v. Aguallo*, 322 N.C. 818, 821-22, 370 S.E.2d 676, 677 (1988).

In any event, it is clear in this case that Rosenfeld was, in fact, properly qualified to state an opinion as to whether the burns she observed on the victim were similar to other burns of this type which she had seen before. Prior to stating such an opinion, Rosenfeld testified to the following: (1) she was a registered nurse in the burn-trauma unit at Sentara Norfolk General Hospital; (2) she had been working there for over eight years in November 1993; (3) she had worked one-on-one with Fleetwood while she was in the burn-trauma unit; (4) she was familiar with the medications administered to

Fleetwood, the reasons for their use, and the reasons for any change in medications; and (5) she had administered Versed to patients for over eight years. "The essential question in determining the admissibility of opinion evidence is whether the witness, through study or experience, has acquired such skill that he was better qualified than the jury to form an opinion on the subject matter to which his testimony applies." *State v. Mitchell*, 283 N.C. 462, 467, 196 S.E.2d 736, 739 (1973); *see also* N.C.G.S. § 8C-1, Rule 702 (1992). The evidence in the present case clearly indicates that Rosenfeld, through both study and experience, was better qualified than the jury to form an opinion on the cause of Fleetwood's death and on the effect of the sedative medication Versed. Rosenfeld's position as a nurse was merely a factor to be considered by the jury in evaluating the weight and credibility of her testimony.

[4] Defendant also argues that the trial court erred by allowing Rosenfeld to rely upon the hearsay opinions of other medical personnel in rendering her opinion as to the victim's cause of death. Defendant notes that Rosenfeld "testified that she based her opinion on her observations of [the victim] and the notes made by other medical personnel in the hospital records about [the victim]'s death."

"Hospital records, when offered as primary evidence, are hearsay. However, we think they come within one of the well recognized exceptions to the hearsay rule—entries made in the regular course of business." *Sims v. Charlotte Liberty Mut. Ins. Co.*, 257 N.C. 32, 35, 125 S.E.2d 326, 328 (1962). Thus, the hospital records offered at the trial are hearsay, but they fall within an exception to the hearsay rule. *See* N.C.G.S. § 8C-1, Rule 803(6) (1992). Nevertheless,

> [i]n instances where hospital records are legally admissible in evidence, proper foundation must, of course, be laid for their introduction. The hospital librarian or custodian of the record or other qualified witness must testify to the identity and authenticity of the record and the mode of its preparation, and show that the entries were made at or near to the time of the act, condition or event recorded, that they were made by persons having knowledge of the data set forth, and that they were made *ante litem motam*. The court should exclude from jury consideration matters in the record which are immaterial and irrelevant to the inquiry, and entries which amount to hearsay on hearsay.

*Sims*, 257 N.C. at 35, 125 S.E.2d at 328.

In the instant case, the records detailed the victim's treatment, progress, deterioration, and death. Rosenfeld testified that she was a registered nurse working in the burn-trauma unit of Sentara Norfolk General Hospital, that she was familiar with Fleetwood's medical records, that the records were made during Fleetwood's stay at Sentara Norfolk General Hospital, that the records were kept contemporaneously with Fleetwood's care, and that the records were kept by the hospital in the regular course of the hospital's business. Thus, the State laid a proper foundation for the introduction into evidence of Fleetwood's medical records. Accordingly, we reject these assignments of error.

[5] By two assignments of error, defendant argues that the trial court erred by permitting a prosecutor to make grossly improper statements during closing argument. Defendant objected to only one of these allegedly improper statements.

The arguments of counsel are left largely to the control and discretion of the trial judge, and counsel will be granted wide latitude in the argument of hotly contested cases. *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). "Counsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom." *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). Where a defendant does not object at trial, "review is limited to an examination of whether the argument was so grossly improper that the trial judge abused his discretion in failing to intervene *ex mero motu*." *State v. Gladden*, 315 N.C. 398, 417, 340 S.E.2d 673, 685, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986). Therefore, this Court's duty is limited as follows:

> Where defendant fails to object to an alleged impropriety in the State's argument and so flag the error for the trial court, "the impropriety . . . must be gross indeed in order for this court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it."

*State v. Abraham*, 338 N.C. 315, 338, 451 S.E.2d 131, 143 (1994) (quoting *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979)) (alteration in original). In determining whether the prosecutor's argument was grossly improper, this Court must examine the argument in the context in which it was given and in light of the overall factual circumstances to which it refers. *State v. Alston*, 341 N.C. 198, 461 S.E.2d 687 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 100 (1996).

In the instant case, during his closing argument, the prosecutor stated, "And I submit to you that if that child had seen her mother's face and start[ed] going off [sic] in there, who knows what would have happened to them. That's what the evidence shows." Defendant did not object to this argument at trial. However, on appeal, defendant maintains that this argument is entirely speculative, with no basis in the record. Defendant further argues that there is no evidence to support an inference that the victim concealed her face from her children to prevent a scene in which defendant might assault her children. We conclude that the prosecutor's argument was not so grossly improper as to require the trial judge to intervene *ex mero motu* during the prosecutor's closing argument.

**[6]** Defendant also argues that the trial court erred in overruling his objection to another portion of the prosecutor's closing argument. The prosecutor said:

> Ladies and gentlemen of the jury, the defendant may come to you and argue that this is a murder trial, that we put on evidence of domestic abuse, but this isn't a domestic abuse trial. Well, I would submit to you, ladies and gentlemen of the jury, that it is always going to be about domestic abuse until they kill them.
>
> [DEFENSE]: Objection.
>
> THE COURT: Overruled.
>
> [PROSECUTOR]: Until they kill them. And that's what he's done. He's killed her.

Defendant contends that the prosecutor's argument sought to use public sentiment against domestic abuse to enlist the jurors help in a general effort to deter abusive spouses and boyfriends from escalating the level of abuse to murder. We find no reversible error.

The prosecutor's argument did not exceed the wide latitude allowed counsel in stating contentions and drawing inferences from the evidence. *Cf. State v. Syriani*, 333 N.C. 350, 398-99, 428 S.E.2d 118, 144 (finding no gross impropriety even though the prosecutor's argument touched upon facts not testified to and finding that the arguments were reasonable inferences based on the evidence and were within the wide latitude properly given counsel in argument), *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). The guilt-phase evidence of defendant's abuse of the victim, both physical and emo-

tional, was clear and uncontradicted. The prosecutor never suggested that the jury should convict defendant in order to prevent him from killing or battering again or that the jury should convict him because other batterers kill their victims. *See State v. Payne*, 328 N.C. 377, 402 S.E.2d 582 (1991) (improper to urge jury to convict defendant in order to prevent him from killing again); *State v. Scott*, 314 N.C. 309, 333 S.E.2d 296 (1985) (improper to urge jury to convict defendant because other impaired drivers cause other accidents). Accordingly, we conclude that the trial court did not err in overruling defendant's objection to the prosecutor's argument.

[7] By another assignment of error, defendant contends that the trial court erred by conducting unrecorded bench conferences with defense counsel and counsel for the State. Defendant contends that these unrecorded bench conferences violated his state and federal constitutional rights even though he was present in the courtroom and made no request to be present at the bench and made no objection to his absence. Defendant acknowledges that we have previously rejected similar contentions. *See State v. Buchanan*, 330 N.C. 202, 410 S.E.2d 832 (1991). Having considered defendant's argument with regard to this issue, we find no compelling reason to depart from our prior holding. Accordingly, we reject this assignment of error.

[8] By an assignment of error, defendant contends that the trial court erred by failing to intervene *ex mero motu* to prevent the prosecutor from claiming during the penalty-phase closing argument that defendant had lied during his testimony. Defendant's assignment of error is directed to the prosecutor's comment, "Well, putting the hand on the Bible and told about 35,000 whoppers and then he walked on it and did it." This comment, standing alone, does not equate to the type of specific, objectionable language referring to defendant as a liar that would require that defendant be granted a new capital sentencing proceeding. *Cf. State v. Locklear*, 294 N.C. 210, 214-18, 241 S.E.2d 65, 68-70 (1978) (prosecutor asserted defendant was "lying through [his] teeth" and "playing with a perjury count"); *State v. Miller*, 271 N.C. 646, 157 S.E.2d 335 (1967) (prosecutor stated he knew defendant "was lying the minute he said that" and referred to defendant as "habitual storebreaker" when nothing in the record supported such reference).

In the instant case, many eyewitnesses described defendant's physical and emotional abuse of the victim. Yet, defendant denied

such abuse. Given this context, the prosecutor's argument was "no more than an argument that the jury should reject the defendant's testimony" because "his version of the events [was] unbelievable." *State v. Solomon*, 340 N.C. 212, 220, 456 S.E.2d 778, 784, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 438 (1995). Clearly, this argument was not so grossly improper as to require the trial court to intervene *ex mero motu*. *State v. McNeil*, 324 N.C. 33, 48, 375 S.E.2d 909, 924 (1989), *sentence vacated on other grounds*, 494 U.S. 1050, 108 L. Ed. 2d 756 (1990). Accordingly, we reject defendant's final assignment of error.

## PRESERVATION ISSUES

**[9],[10],[11],[12],[13],[14]** Defendant raises six additional arguments which he concedes have been decided against him by this Court: (1) the trial court erred by granting the State's motion to prohibit defense counsel from discussing parole eligibility for a life sentence during penalty-phase closing arguments; (2) the trial court erred by allowing defendant's jury to determine that the murder was "especially heinous, atrocious, or cruel" based upon unconstitutionally vague instructions that failed to distinguish death-eligible murders from murders that are not death-eligible; (3) the trial court's capital sentencing jury instructions that defined defendant's burden of persuasion to prove mitigating circumstances as evidence that "satisfies" each juror constituted plain error and violated due process and the Eighth and Fourteenth Amendments because that definition did not adequately guide the jury's discretion regarding the requisite degree of proof; (4) the trial court committed plain error that violated the Eighth and Fourteenth Amendments by allowing the jury to refuse to give effect to mitigating evidence if the jury deemed the evidence not to have mitigating value; (5) the trial court committed plain error by allowing jurors not to give effect to mitigating circumstances found by the jurors; and (6) the trial court erred by sentencing defendant to death because the death penalty is inherently cruel and unusual, and the North Carolina capital sentencing scheme is unconstitutionally vague and overbroad.

Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for any possible further judicial review of this case. We have carefully considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Accordingly, we reject these arguments.

## PROPORTIONALITY REVIEW

[15] Having concluded that defendant's trial and separate capital sentencing proceeding were free of prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. It is our duty in this regard to ascertain: (1) whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2).

In this case, the sole aggravating circumstance submitted to and found by the jury was that the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9). After thoroughly examining the record, transcripts, and briefs in the present case, we conclude that the record fully supports the sole aggravating circumstance submitted to and found by the jury. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Distinguishing features of this case are: (1) defendant was convicted of first-degree murder under the theory of premeditation and deliberation; (2) the first-degree murder was preceded by prior physical and mental abuse of the victim; (3) the aggravating circumstance submit-

ted to and found by the jury was "that the killing was especially heinous, atrocious, or cruel," N.C.G.S. 15A-2000(e)(9); (4) defendant killed the victim by intentionally setting her on fire and watching her burn; and (5) defendant showed no remorse for his actions and appeared in full control of his mental and physical condition. Although the jury considered twenty-five mitigating circumstances, it found only seven. Of these seven, only one was a statutory mitigating circumstance, that defendant had no significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1).

It is also proper to compare this case to those where the death sentence was found proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although we have repeatedly stated that we review all of the cases in the pool when engaging in our statutory duty, it is worth noting again that "we will not undertake to discuss or cite all of those cases each time we carry out our duty." *Id.* It suffices to say here that we conclude the present case is more similar to certain cases in which we have found the death sentence proportionate than to those in which we have found the sentence disproportionate or to those in which juries have consistently returned recommendations of life imprisonment. *See, e.g., State v. Burr*, 341 N.C. 263, 461 S.E.2d 602 (1995) (death sentence proportionate for murder of a four-month-old child where the jury found as the only aggravating circumstance that the murder was especially heinous, atrocious, or cruel), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 526 (1996); *State v. Spruill*, 338 N.C. 612, 452 S.E.2d 279 (1994) (death sentence proportionate for murder of an acquaintance where the jury found as the only aggravating circumstance that the murder was especially heinous, atrocious, or cruel), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 63 (1995); *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118 (death sentence proportionate for murder where the jury found as the only aggravating circumstance that the murder was especially heinous, atrocious, or cruel and where defendant was convicted solely under the theory of premeditation and deliberation); *State v. Huffstetler*, 312 N.C. 92, 322 S.E.2d 110 (1984) (death sentence proportionate for murder of elderly female where the jury found as the only aggravating circumstance that the murder was especially heinous, atrocious, or cruel), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985).

After comparing this case to other roughly similar cases as to the crime and the defendant, we conclude that this case has the characteristics of first-degree murders for which we have previously upheld the death penalty as proportionate. Accordingly, we cannot conclude

as a matter of law that the death sentence is excessive or disproportionate. Therefore, the judgment of the trial court must be and is left undisturbed.

NO ERROR.